## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

CORTEZ SHISLER,

        Petitioner,

v.                                      Case Number: 07-cv-10120
                                           Honorable Nancy G. Edmunds

BLAINE LAFLER,

        Respondent.
_____/

## OPINION AND ORDER
## DENYING PETITION FOR WRIT OF HABEAS CORPUS

### I.  Introduction

Petitioner Cortez Shisler, a state inmate currently incarcerated at the St. Louis

Correctional Facility in St. Louis, Michigan, filed a *pro se* petition for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254, alleging that he is incarcerated in violation of his constitutional

rights.  Petitioner was convicted of first-degree felony murder, MICH. COMP. LAWS

§ 750.316B, and felony firearm, MICH. COMP. LAWS § 750.227BA, by a Wayne County,

Michigan, circuit court jury.  He was sentenced to life imprisonment for the first-degree-felony-

murder conviction and the mandatory two-years imprisonment for the felony-firearm conviction.

He is now challenging his state convictions and sentences on the following three grounds: (1) a

*Batson*[1] violation, (2) juror bias, and (3) a Confrontation Clause violation.  For the reasons stated

below, the Court denies the petition.

_____

[1]*Batson v. Kentucky*, 476 U.S. 79 (1986).

## II.  Substantive Facts

This case arises as a result of an incident that occurred on June 19, 2003, in Detroit, Michigan, which resulted in the death of thirty-seven-year-old Michael Basic.  Petitioner was charged with the murder, along with his brother, co-defendant Vincent Shisler.  Petitioner and the co-defendant were tried together but with two juries.  Trial began on May 3, 2004.

Kathyrn Walters, the victim's sister, was first to testify.  According to Ms. Walters's testimony, her brother drove a 1980s Cadillac and lived about a block and a half from the site of his murder.  She said that she identified his body at the Wayne County morgue.

During her testimony, Ms. Walters was shown a five-page document, People's Proposed Exhibit No.2, which she identified as her brother's cellular phone bill.  The bill reflected some calls having been made prior to 1:20 a.m., which was the time the events in question took place.  She testified that she recognized the phone number which had been called prior to 1:20 a.m.; it was the phone number of her brother's girlfriend.  The bill also showed a series of calls made after 1:20 a.m.; those calls began at 2:30 or 3:00 a.m.  Ms. Walters testified that she did not recognize those phone numbers.

Detroit Police Officer Frank Horan, an evidence technician, testified next.  He said he and his partner, Officer Tom Smith, were called to the scene, which was about 3:15 a.m.  According to Officer Horan, he and his partner split the duties; his partner took notes and made a sketch, while he took photographs.  He said that the only evidence they collected at the scene was a brand-new pack of Winston cigarettes.  Officer Horan said they did not find any shell casings.

Petitioner's jury was then excused for the testimony of witness Jacqueline Bryant.  Ms.

2

Bryant testified, before the co-defendant's jury, that she knew Petitioner and the co-defendant. She identified both in court. Ms. Bryant testified that she had had a romantic relationship with Petitioner. She said that, on the night in question, both Petitioner and the co-defendant were living at 13303 Longview. She also testified that she received several phone calls in the early morning hours of June 19, 2003. She said there were several calls because the phone kept disconnecting. According to Ms. Bryant's testimony, the co-defendant was on the other end. He told her that he needed gas money for a car.

Ms. Bryant further testified that, sometime after June 19, 2003, she overheard a conversation in which the co-defendant said that he shot a guy because the guy had no money. She said Petitioner, Marcell Beason, and Jermaine Drake were present during that conversation. Ms. Bryant also testified that she heard the co-defendant say that Petitioner drove the car. Ms. Bryant testified that she noticed a blue, older model Cadillac parked near the area where Petitioner and the co-defendant lived.

At the conclusion of Ms. Bryant's testimony, the prosecutor informed the trial court that he would be asking the court to allow him to elicit the same testimony from Ms. Bryant as to what she heard the co-defendant say about his own participation in the murder and what he said about Petitioner's participation (that Petitioner drove the car), as an adoptive admission by Petitioner. The prosecutor informed the court that the same type of conversation would, if allowed, be elicited from another prosecution witness, Illandra (Allandra) Carter, who would testify that she was also privy to a conversation with Petitioner and the co-defendant about the murder and the taking of the car. The prosecutor offered, to the court, the statements of the two witnesses, but the court ruled that a special record should be made in which both witnesses

3

would testify so that the court could determine, based on their testimony and not on their police statements, the circumstances surrounding the conversations.  Petitioner's jury was then called back into the courtroom.

The following testimony took place before Petitioner's jury.  Detroit Police Investigator Barbara Simon testified that she was assigned to the Homicide Section, and that she was the officer in charge of the case, having taken that duty over from Officer Reynolds, who was transferred to another squad.  Officer Simon testified that, although she was not the officer in charge at the time, she did come into contact with Petitioner for the purpose of talking to him about the homicide that had occurred at the corner of Morang and McKinney on June 19, 2003. She said that, after advising Petitioner of his constitutional rights, she took a statement from him; the statement was in her handwriting, but Petitioner signed the bottom of each page of the statement.  Before taking his statement, Officer Simon said that she obtained background information from him, which included his aunt's name, Angela Drake, and her phone number. She then took the following statement from Petitioner, which was read into the record:

> Question: Mr. Shisler, what can you tell me regarding the fatal shooting of Mr. Michael Basic which occurred on 6-19-03?
> Answer: First of all, it was early in the morning.  Me and my cousin Vincent had just – had just my house on Longview (sic).  We were walking down the street. We were smoking weed and drinking.  It was raining outside.  We walked past the gas station.  We turned around because we were going back to my house.  Vincent said, "I'm about to get us a ride home."  That's when we saw the white man at the gas station.
> Vincent ran up on the man.  Vincent had the gun in his hand.  Vincent didn't say anything to the man.
> His car door was open.  The man was getting ready to get into his car.  That's when Vincent shot the man.  He also shot the driver's side window out.
> After he shot the man, Vincent said, "Come on, come on."  The keys was in the car.  Vincent said, "Come on, stop being a bitch."
> I got in the passenger side.  Vincent got in on the driver's side and we drove off. Vincent pushed the glass out of the driver's side because some of the glass had

4

been shot out.  We were driving over to Jackie's house.  She lived — lives on Wilshire.  The car didn't have much gas in it.  The man's phone was in the car, a silver phone.

I used the phone to call Jackie to see if we could get some money for some gas. We drove to Jackie's house, blew the horn.  It was late.  Jackie never came out so we just pulled off.

The car ran out of gas on Wilshire.  We got out of the car and walked to my house which was two blocks away.  The car, a Cadillac, sat on Wilshire for a few days.

Question:  What kind of gun did Vincent have?

Answer:  A .22.  And he signed his name Cortez Shisler.

Question:  Who did the gun belong to?

Answer:  It was my gun.  And he signed his name Cortez Shisler.

Question:  How many times did Vincent shoot the man?

Answer:  I don't know.  It was over three times.  I don't how many times for sure. And he singed his name Cortez Shisler.

Question:  What happened to the .22?

Answer:  After we got to my house, I made Vincent put the gun up in the basement.  And he signed his name Cortez Shisler.

Question:  Did you or Vincent know the man who got shot?

Answer:  No.  And he signed his name Cortez Shisler.

Question:  Did Vincent say anything to the man before he shot him?

Answer:  No.  And he signed his name Cortez Shisler.

Question:  Did you have any type of weapon?

Answer:  No.  And he signed his name Cortez Shisler.

Question:  Did you or Vincent tell anyone about the shooting?

Answer:  Yes, a few minutes after the shooting I called my cousin Marcell Beason, black male, 22, lives at 13303 Longview, and I told him what had just happened.  He told me you all are stupid and to get my ass home.

Question:  When you called your cousin, whose phone did you use?

Answer:  I used the man's phone who had got shot.  And he signed his name Cortez Shisler.

Question:  What happened to the man's phone?

Answer:  I don't know.  I think I gave it away.  I don't know for sure.  And he signed his name Cortez Shisler.

Question:  Did you and Vincent ever talk about the shooting?

Answer:  No.  He never said anything about it.  And he signed his name Cortez Shisler.

Question:  Mr. Shisler, did I threaten you in any way to make a statement or answer any questions?

Answer:  No.  And he signed his name Cortez Shisler.

Question:  Mr. Shisler, did I promise you anything to make a statement or answer any questions?

Answer:  No.

And he signed his name Cortez Shisler.

5

Question:  Mr. Shisler, were you deprived of any food, water, or the use of a
restroom?
Answer:  No.  And he signed his name Cortez Shisler.
Question:  Mr. Shisler, are you under any doctor's care?
Answer:  No.  And he signed his name Cortez Shisler.
Questions: Mr. Shisler, are you on any type of medication?
Answer: No.
And he signed his name Cortez Shisler.
Question:  Mr. Shisler, do you use any type of drugs?
Answer:  Yes, I smoke weed.
And he signed his name Cortez Shisler.
Question:  Mr. Shisler, did you see me write out your statement the way you told
me?
Answer:  Yes.  And he signed his name Cortez Shisler.
Question: Mr. Shisler, did you have –I'm sorry.  Mr. Shisler, did I ever leave the
room while taking this statement?
Answer:  No.  And he signed his name Cortez Shisler.
Question:  Mr. Shisler, did you have a chance to read your statement and make
corrections?
Answer:  Yes, I did.  And he signed his name Cortez Shisler.
Question:  Mr. Shisler, is the statement you gave and the questions you answered
true?
Answer:  Yes, it is.  And he signed his name Cortez Shisler.  And he sign (sic)
Cortez Shisler again.

(Trial Tr. 14-19, May 5, 2004.)

The following testimony then took place before both juries.  Deputy Chief Medical

Examiner Cheryl Loewe testified next.  She said that she was involved in examining the body of

Michael Basic; an autopsy was conducted on June 20, 2003.  She testified that Basic had been

pronounced dead at St. John's Hospital in Detroit.  She said that, at the hospital, the left side of

the his chest had been opened in an attempt to save his life.  According to Dr. Lowe, Basic had

two gunshot wounds close to one another on his left back; two bullets were recovered from the

front of the body.  One of the gunshot wounds, the one located on the left flank, displayed a

muzzle imprint from the barrel of the gun, and there was also soot, or burned gunpowder, in the

wound, indicating that the barrel of the gun had been held in contact with the body as the

6

weapon was discharged.  She said the bullet that caused the wound higher up on the back passed through the left rib, injured the left kidney, the pancreas, the small bowel, and the right side of the liver, which resulted in internal bleeding into the abdominal cavity.  The bullet that caused the lower wound to the flank, passed through the connected tissue that suspends the bowel from the small bowel.  Dr. Lowe testified that there was also bruising within the body, to the lower portion of the heart and the lower lobe of the left lung, which was caused by the contact wound. She explained that a bullet fired at contact range caused the organ to slam against the body cavity, causing bruising.

Dr. Loewe further testified that Basic had a laceration on the back of the left middle finger.  She said the laceration could have been caused by some type of struggle, or by a blunt force trauma to the deceased's hand.

Detroit Police Officer Errol Davis testified next.  Officer Davis testified that, in June of 2003, he lived in the area of McKinney and Morang.  He said that, around 1:30 a.m., on the night in question, he was awakened by the sound of gunshots.  He said he got out of bed and went to the window of his house, which looked out onto the gas station across the street.  He said he saw a four-door, light-colored Cadillac sitting in the gas station.  According to Officer Davis, it was raining at the time.  Officer Davis testified that he saw one individual, a black male, stooping down by the driver's side door of the Cadillac, as if he were trying to pick up something.  Officer Davis testified that the man had on dark clothes and was wearing a hooded sweatshirt.  He said the man then stood up and went around the car and got in on the passenger's side.  Officer Davis also said that there was another person in the driver's seat.

Officer Davis further testified that he then started down the stairs and, when he got to his

front door, he saw the Cadillac back up, spin around, and speed off down McKinney.  He then

looked over at the gas station and saw an individual lying on his back.  Officer Davis testified

that he went over to investigate and saw that the individual was a white male who had been shot;

the man did not say anything, but he did have a pulse and was gasping.  Officer Davis said he

noticed a pack of cigarettes on the ground.  He said he called dispatch and informed them of the

situation.  He said he stayed with the man until the first scout car arrived.  According to Officer

Davis, he then went back to his house.  He said that eventually Homicide came to his house and

took a statement from him.

The following occurred outside the presence of both juries; regarding the testimony of

prosecution witness Illandra (Allandra) Carter and whether both juries would hear her testimony.

Illandra (Allandra) Carter testified that she knew the co-defendant, identifying him in

court, and that she knew Petitioner, identifying him in court.  She testified that some time in

June, Petitioner came home angry, believing someone stole something from him.  He then told

her he and the co-defendant were going to do something about the theft.  Then, later that night,

after she fell asleep, the co-defendant woke her up and told her they were leaving.  She said, at

that time, Petitioner had a gun, but when they came back, the co-defendant had the gun.

According to Ms. Carter's testimony, the co-defendant told her he had shot a guy six times.

When she asked him if the guy had died, the co-defendant responded, "he didn't know and he

don't give a fuck if he did."  (Trial Tr. 140, May 5, 2004.)  Ms. Carter said Petitioner was present

when the co-defendant made that statement.  She further testified that both Petitioner and the co-

defendant told her they took a phone and a car.  Ms. Carter testified she saw the car on Wilshire.

On cross-examination by the co-defendant's counsel, Ms. Carter testified that the

8

conversations she described occurred at Erma Shisler's house, the aunt of both Petitioner and the co-defendant. She also acknowledged that she had been staying there at that time. She testified that, as far as the conversation before the event was concerned, the co-defendant told her they were going to rob somebody and that Petitioner said the same. She testified that they had a gun out when that was said. She again said Petitioner had the gun, but when they returned, the co-defendant had it. She also testified that when they returned, the co-defendant spoke first and said he had "shot the nigga six times." (Trial Tr. 140, May 5, 2004.) She explained that a "nigga" could be anybody, not just a black man. She testified that Petitioner told her that they took the cell phone, the house phone, and the car.

At the conclusion of Ms. Carter's testimony, the prosecutor argued that her testimony should be admissible before both juries, since the statements made by both Petitioner and the co-defendant were declarations against penal interest and the statements each made in the presence of the other constituted adoptive admissions. The trial court then ruled that the testimony of Ms. Carter, and also that of Ms. Bryant, could be admitted before both juries as adoptive admissions.

Ms. Bryant was then recalled to the stand to testify before Petitioner's jury (she previously testified before the co-defendant's jury only). She again testified that she knew Petitioner and the co-defendant. She said she had dated Petitioner and knew the co-defendant through Petitioner.

According to Ms. Bryant's testimony, in the early morning hours, on the day in question, she received phone calls from the co-defendant at her mother's house. Sometime after she received the calls, there occurred a conversation in which she, the co-defendant, Petitioner, and two of Petitioner's and the co-defendant's cousins were present. She testified that the co-

9

defendant did the talking and that Petitioner said nothing.  She denied telling the police that

Petitioner told her and Marcell that they had robbed a guy at a gas station.  When asked if he (the

prosecutor) then interviewed her and asked her if her statement to the police was the truth, she

responded that she was not asked if her statement was the truth.

Allandra Carter then testified before both juries.  She said she knew Petitioner and the co-

defendant.  She said she had dated the co-defendant and knew Petitioner through him.

Ms. Carter testified that, on June 19, 2003, she lived with the co-defendant, Petitioner, Marcell

Beason, and Erma Shisler.  She said she was aware of a homicide that occurred on that date at a

gas station at around 1:20 a.m.  According to her, prior to that time, Petitioner and the co-

defendant had been at the house, but she said that there came a point in time when they left the

house together.  Ms. Carter said that when they left, Petitioner had a black gun in his hand.  She

said there was a discussion about where they were going; Petitioner said he was "fenna go rob

somebody," and the co-defendant said he was "about to go rob somebody."  (Trial Tr. 137, May

5, 2004.)  Ms. Carter said after they left, she went to bed.

According to Ms. Carter's testimony, she was then awakened sometime later by a tap at

her bedroom window.  She said she got up and went to the window; Petitioner and the co-

defendant were at the window.  She testified that they came into the house, that Petitioner told

her that they had just robbed somebody, and that the co-defendant said he had just "shot that

nigga six times."  (Trial Tr. 140, May 5, 2004.)  Ms. Carter said when she asked the co-

defendant if the man had died, he said "he ain't give a fuck if he did."  (Trial Tr. 140, May 5,

2004.)  She further testified that Petitioner told her that they took the car, a cell phone, and a

regular phone.  The co-defendant confirmed that those items were taken.  Ms. Carter said when

10

they returned, Petitioner no longer had the gun, but rather, the co-defendant had it. She said she saw the vehicle that was allegedly taken, two streets over, on Wilshire; a four-door, blue Cadillac. She said it was parked at the home of one of Petitioner's and the co-defendant's friends.

Bachir Kaddoura, a witness to the incident, testified that he worked midnights at the Marathon gas station at Morang and McKinney, where the incident occurred. He testified that he was working that night, when a man got shot. He said he knew the man, Michael Basic, because he came into the station about three times a week. Mr. Kaddoura said Mr. Basic came into the station and bought a pack of cigarettes that night. According to Mr. Kaddoura, after Mr. Basic bought his cigarettes, he went back out to his car. Mr. Kaddoura said he then heard three or four shots, looked out the window, and saw two people alongside Mr. Basic and his car; the two people were men. Mr. Kaddoura testified that one of the two men was sitting in Mr. Basic's car, and the other man had his hand in Mr. Basic's pocket. He testified that the man took keys from Mr. Basic's pocket and then got into the car and took off. Mr. Kaddoura said after the car took off, he called the police.

Detroit Police Investigator Barbara Simon was recalled to give testimony before both juries. She testified that she was the officer in charge of the case. She testified that the vehicle which had been taken in the robbery was recovered from the front of 13127 Wilshire on June 27, 2003; that location was about two blocks away from where Petitioner and the co-defendant lived. Officer Simon also said there was a cell phone taken during the course of the robbery. Officer Simon said she told the victim's family not to turn the cell phone off, so that they could see if any calls were made after the victim's death. The victim was shot about 1:30 a.m.

11

Officer Simon testified that at around 2:39 a.m., on the night in question, a call was made from Mr. Basic's cell phone to a phone number, which was the phone number of where Ms. Bryant, Petitioner's girlfriend, stayed.  She said another call was made at about 2:44 a.m., to a phone number, which was the phone number of Alfred Body, who lived at the house on Wilshire where Mr. Basic's car was recovered; Body was a friend of Petitioner's and the co-defendant's. Officer Simon further testified that another call was made at 2:53 a.m., to a number, which was the phone number of Teresa Payne, Petitioner's mother.  According to Officer Simon, three more calls were made to Petitioner's girlfriend, one at 2:58 a.m., one at 3:00 a.m., and one on June 20, at 9:05 a.m.  Officer Simon said calls were also made to Clarissa Campbell, the co-defendant's girlfriend, on June 22, at 1:01 a.m., and on June 23, at 10:58 a.m., to Petitioner's residence, and on June 23, at 12:48 p.m., again to Petitioner's mother.

Yolanda O'Neal, another witness to the incident, testified that in the early morning hours of June 19, 2003, she was pulling into the Marathon gas station located at the intersection of Morang and McKinney, when she saw a man on the ground and another man in a car.  She said the man in the car was pulling on the shirt of the man on the ground, going through his pockets and throwing stuff into the car.  According to Ms. O'Neal's testimony, when the man in the car was finished, he let the man on the ground go and the man fell back.  She said the man in the car then kicked the feet of the man on the ground, backed the car up, and pulled out onto McKinney and drove away.  Ms. O'Neal said there were two people in the car, one on the passenger side, and one on the driver's side.  She said the man in the driver's seat was the one who was leaning out of the car and holding the man by the shirt; she described the man on the ground as a white man and the two men in the car as black men.

Petitioner presented no evidence.  The jury found Petitioner guilty of the above-stated charges.  He was sentenced as stated.

### III.  Procedural Facts

Following, Petitioner, through counsel, filed an appeal of right in the Michigan Court of Appeals, raising the following three claims:

I.      Is a new trial required where the prosecution improperly exercised peremptory challenges to excuse African-American jurors in violation of *Batson v Kentucky*?

II.     Was [Petitioner] denied a fair trial where two members of the deliberating jur[ors] were seen talking to a member of the victim's family/friends?

III.    Did the admission of the co-defendant's statements to Ms. Carter violate the hearsay rule and [Petitioner's] state and federal constitutional rights to confrontation and to a fair trial?

On October 20, 2005, in an unpublished *per curiam* opinion, the Michigan Court of Appeals affirmed Petitioner's convictions and sentences.  *People v. Shisler*, No. 256122, 2005 WL 2679686 (Mich.Ct.App. Oct. 20, 2005).  Subsequently, Petitioner filed an application for leave to appeal that decision in the Michigan Supreme Court, raising the same three claims.  The Michigan Supreme Court denied the application on April 28, 2006.  *People v. Shisler*, 474 Mich. 1126, 712 N.W.2d 458 (2006).  Petitioner's motion for reconsideration from that decision was denied on July 31, 2006.  *People v. Shisler*, 476 Mich. 861, 718 N.W.2d 346 (2006).  Petitioner neither filed a writ of certiorari in the United State Supreme Court nor did he file a post conviction motion, pursuant to Mich.Ct.R. 6.500 *et. seq.*, in the state trial court.

On January 8, 2007, Petitioner this habeas petition, raising the same claims as raised in both state appellate courts.

### IV.  Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this

Court's habeas corpus review of state-court decisions.  Specifically, 28 U.S.C. § 2254(d) states

in pertinent part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the State court proceedings.

Under (d)(1), a federal court may grant a writ of habeas corpus under two different

clauses, both of which provide two bases for relief.  Under the "contrary to" clause, a federal

court may grant habeas relief if the state court arrives at a conclusion opposite to that reached by

the Supreme Court on a question of law or if the state court decides a case differently than the

Supreme Court has decided on a set of materially indistinguishable facts.  *Williams v. Taylor*,

529 U.S. 362, 405-06 (2000).  The words "contrary to" should be construed to mean

"diametrically different, opposite in character or nature, or mutually opposed."  *Id.*

Under the "unreasonable application" clause, a federal court may grant habeas relief if

the state court identifies the correct governing legal principle from the Supreme Court's

decisions but unreasonably applies that principle to the facts.  *Williams*, 529 U.S. at 407-08.

Relief is also available under this clause if the state court decision either unreasonably extends or

unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context.

*Id.*, at 407; *Arnett v. Jackson*, 393 F.3d 681, 686 (6th Cir. 2005).  The proper inquiry for the

14

"unreasonable application" analysis is whether the state court decision was "objectively

unreasonable" and not

simply erroneous or incorrect. *Williams*, 529 U.S. at 407; *Lordi v. Ishee*, 384 F.3d 189, 195 (6th

Cir. 2004).

In analyzing whether a state court decision is "contrary to" or an "unreasonable

application" of clearly established Supreme Court precedent, a federal court may only look to the

holdings, as opposed to dicta, of the Supreme Court's decisions as of the time of the relevant

state-court decision. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003); *Williams*, 529 U.S. at 412.

## V. Analysis

### A. *Batson* Claim

In his first claim, Petitioner alleges that the trial court erred in finding that the

prosecutor's reasons for peremptorily dismissing five prospective African-American jurors had

adequate race-neutral explanations and were not merely a pretext for racial discrimination under

*Batson*.

In *Batson*, the United States Supreme Court held that "[a]lthough a prosecutor ordinarily

is entitled to exercise permitted peremptory challenges 'for any reason at all, as long as that

reason is related to his view concerning the outcome' of the case to be tried, the Equal Protection

Clause forbids the prosecutor to challenge potential jurors solely on account of their race[.]"

*Batson*, 476 U.S. at 89 (citation omitted).[2]  In evaluating *Batson* claims, a court must follow a

---

[2]*Batson* has been extended to prohibit gender-based peremptory challenges, *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994).  Further, *Batson* has been extended to prohibit impermissible race or gender-based challenges by criminal defendants, *Georgia v. McCollum*, 505 U.S. 42 (1992) and by parties in civil cases, *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614 (1991).

15

three-step process: (1) the defendant must make a *prima facie* showing that the prosecutor has exercised peremptory challenges on the basis of race; (2) if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question; and (3) the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Hernandez v. New York*, 500 U.S. 352, 358-59 (1991) (plurality opinion) (citations omitted) (citing *Batson*, 476 U.S. at 96-98); *see also*, *Miller-El v. Cockrell*, 537 U.S. 322, 328-29 (2003).

With respect to the first prong, a *prima facie* showing requires a defendant to show that the prosecutor exercised a peremptory challenge against a member of a cognizable racial group, and that the relevant circumstances raise an inference that the prosecutor removed the potential juror because of his or her race. *See Batson*, 476 U.S. at 96-97. Further, "a defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Johnson v. California*, 545 U.S. 162, 170 (2005). Under the AEDPA, a state court's determination that a prosecutor's use of peremptory challenges was not motivated by discrimination will be upheld, and a petitioner will not be entitled to habeas relief, unless it can be said that the state court's decision amounted to an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see Miller-El*, 537 U.S. at 348.

In addressing this claim, Michigan Court of Appeals stated:

> The use of a peremptory challenge to strike a potential juror solely because of that juror's race violates the Equal Protection Clause of the Fourteenth Amendment. US Const, Am XIV; *Batson v. Kentucky*, 476 U.S. 79, 84; 106 S Ct 1712; 90 L.Ed.2d 69 (1986); *People v. Knight*, 473 Mich. 324, 335; 701 NW2d 715 (2005). Under *Batson*, the United States Supreme Court set forth a three-step process for determining the constitutional propriety of the use of peremptory

16

challenges. *Knight*, *supra* at 336. "First, the opponent of the peremptory challenge must make a prima facie showing of discrimination." *Id.* "Second, if the trial court determines that a prima facie showing has been made, the burden shifts to the proponent of the peremptory challenge to articulate a race-neutral explanation for the strike." *Id.* at 337. "Finally, if the proponent provides a race-neutral explanation as a matter of law, the trial court must then determine whether the race-neutral explanation is a pretext and whether the opponent of the challenge has proved purposeful discrimination." *Id.* at 337-338.

The proper standard of review depends on which *Batson* step is at issue before this Court. *Knight*, *supra* at 338. Where the prima facie showing of discrimination by the opponent of the peremptory challenges is at issue, this Court reviews for clear error the trial court's factual determinations and reviews de novo the trial court's conclusions of law. *Id.* at 342. Where the issue is whether the proponent of the peremptory challenge articulated a race-neutral reason for the use of the peremptory challenge, this Court reviews the issue de novo. *Id.* at 343-344. Finally, whether the opponent of the peremptory challenge has satisfied the ultimate burden of proving purposeful discrimination is a question of fact that is reviewed for clear error. *Id.* at 344.

During voir dire, defense counsel made a *Batson* challenge after the prosecutor used peremptory challenges to excuse four African-American jurors and was preparing to excuse a fifth African-American juror. In response, the prosecutor explained his reasons for excusing the prospective jurors. The prosecutor said he excused juror Bowie because he appeared to be "slow" in answering questions during voir dire and excused juror Whitfield because she was an attorney and had worked for the Legal Aid and Defender's Office. The prosecutor excused Riley-Hathorne because she was a school counselor and because she said she did not want to miss a scheduled meeting. The prosecutor excused juror Holmes because she had a son under the jurisdiction of juvenile court. Finally, the prosecutor stated that he wished to excuse juror Muhammad because he was young, unemployed, had things in common with defendant and glared at the prosecutor. The trial court found no *Batson* violation and ruled that the prosecutor's race-neutral explanations for excluding the five African-American jurors were reasonable and determined that the prosecutor had not engaged in purposeful discrimination.

In this case, the first *Batson* step is moot because the prosecutor offered a race-neutral explanation for his peremptory challenge of the five African-American jurors, and the trial court ruled on the ultimate question of purposeful discrimination. *Knight*, *supra* at 338, citing *Hernandez v. New York*, 500 U.S. 352, 359; 111 S Ct 1859; 114 L.Ed.2d 395 (1991) (plurality opinion). With regard to the second *Batson* step, a *de novo* review of the record indicates

17

that the prosecutor provided race-neutral explanations for all the peremptory challenges used to exclude the five African-American jurors.  Regarding juror Bowie, being "slow" in answering questions was a permissible race-neutral reason for the strike.  *See*, e.g., *Ellis v. Newland*, 23 Fed Appx 734, 735 (CA 9, 2001) (finding no *Batson* violation where one potential juror was challenged on account of her slow and halting answers to questioning); *State v. Guess*, 318 SC 269, 271-273; 457 S.E.2d 6, 7 (1995) (holding that the trial court did not err in concluding the strike of a juror for being a little slow and not knowing what was going on was race-neutral).  Regarding juror Whitfield, the prosecutor expressed legitimate concerns regarding the bias of the prospective juror because of her previous legal aid job.  *See*, e.g., *United States v. Johnson*, 941 F.2d 1102, 1109 (CA 10, 1991) (holding that the prosecutor's explanation for peremptorily striking a black juror because of her legal aid job was race-neutral).  Regarding juror Riley-Hathorne, occupation, including membership in the teaching profession, is also an acceptable, racially neutral reason for a prosecutor to strike prospective jurors.  *See*, e.g., *United States v. Smallwood*, 188 F3d 905, 915 (CA 7, 1999); *Roberts ex rel Johnson v. Galen of Virginia, Inc*, 325 F3d 776, 780-781 (CA 6, 2003).  The proffered reason for excluding juror Holmes was that her son was under the jurisdiction of the juvenile court.  Because the prosecutor's explanation was based on something other than the juror's race and discriminatory intent was not necessarily inherent, we find that the prosecutor's explanation was race-neutral.  *Hernandez*, *supra* at 360.  Regarding juror Muhammad, lack of employment and the display of a negative attitude are race-neutral reasons for using a peremptory challenge.  *See*, e.g., *United States v. Yang*, 281 F3d 534, 549 (CA 6, 2002); *Roberts ex rel Johnson*, *supra* at 780-781 (accepting prosecutor's explanation that jurors were "scowling" as racially neutral reason).  Therefore, we hold that the prosecutor satisfied his burden of production by proffering racially neutral reasons for excluding the five African-American jurors.

Finally, proceeding to the trial judge's ultimate ruling, we cannot conclude that the trial court clearly erred in finding that these reasons were reasonable race-neutral explanations.  The trial judge, who was in the best position to observe the demeanor and credibility of the prosecutor exercising the peremptory challenges, believed his explanations and concluded that the prosecutor did not engage in purposeful discrimination.  Giving the appropriate degree of deference

to the trial court's ultimate finding, *Knight*, *supra* at 344, we hold that the trial court did not clearly err in determining that no *Batson* violation occurred.

*Shisler*, No. 256122, 2005 WL 2679686, at *1-2.

Here, defense counsel made a *Batson* challenge during *voir dire*, after the prosecution had excused four African-American jurors and was preparing to excuse a fifth.  On appeal, the Michigan Court of Appeals not only engaged in a *de novo* review of the record, but provided federal authority supporting the race-neutral explanations offered by the prosecution for striking each prospective juror.

Against that backdrop, the Court concludes that the explanations for excluding the jurors were race-neutral.  Thus, Petitioner has failed to meet his burden regarding racial motivation on the part of the prosecutor with respect to his peremptory challenges to remove five African-Americans from the final jury panel.

Apart from the fact of the exercise of the peremptory challenges, Petitioner has not "provided any other 'relevant circumstances' to inform [the Court] whether the prosecution used the peremptory challenges in a discriminatory manner," and the Michigan Court of Appeals' denial of his *Batson* claim "is therefore not contrary to or an unreasonable application of clearly established Supreme Court precedent."  *Anderson v. Couran*, 227 F.3d 893, 902 (7th Cir. 2000). Petitioner is not entitled to habeas relief on this claim.

**B.  Juror Bias Claim**

In his second habeas claim, Petitioner asserts that he was denied his right to an impartial jury because the trial court conducted an insufficient investigation of his sister-in-law's claim that she saw a man with the victim's family speaking with two of the jurors.

The Sixth Amendment to the United States Constitution guarantees a criminal defendant a trial by an impartial jury.  *Morgan v. Illinois*, 504 U.S. 719, 726-27 (1992).  "In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial,

19

'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).  The presence of even a single biased juror deprives a defendant of his right to an impartial jury.  *See Morgan*, 504 U.S. at 729. *Williams v. Bagley*, 380 F.3d 932, 943-34 (6th Cir. 2004), *cert. denied*, 544 U.S. 1003 (2005).

Jurors are presumed to be impartial.  *See Irvin*, 366 U.S. at 723 (1961).  "[D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation. * * *  Due process means a jury capable and willing to decide the case solely on the evidence before it."  *Smith v. Phillips*, 455 U.S. 209, 217 (1982).  A juror must be able to "lay aside his [or her] impression or opinion and render a verdict based on the evidence presented in court."  *Irvin*, 366 U.S. at 723 (citations omitted).

A biased juror, in the usual sense, "is one who has a predisposition against or in favor of the defendant.  In a more limited sense, a biased juror is one who cannot 'conscientiously apply the law and find the facts.'"  *Franklin v. Anderson*, 434 F.3d 412, 422 (6th Cir. 2006) (quoting *Wainwright v. Witt*, 469 U.S. 412, 423 (1985)).  "If an impaneled juror was actually biased, the conviction must be set aside."  *Hughes v. United States*, 258 F.3d 453, 463 (6th Cir. 2001) (citations omitted).

Moreover, the question of bias of an individual juror at a state criminal trial is a question of historical fact.  *Dennis v. Mitchell*, 354 F.3d 511, 520 (6th Cir. 2003) (citing *Patton v. Yount*, 467 U.S. 1025, 1036 (1984)); *see also Sizemore v. Fletcher*, 921 F.2d 667, 672-73 (6th Cir. 1990) (citing *Smith*, 455 U.S. at 218).  A state court decision on this issue based on a factual determination will not be overturned unless it was objectively unreasonable in light of the evidence presented in the state court proceeding.  *Dennis*, 354 F.3d at 518.  "The question for this Court is simply whether the state court's decision was 'fairly supported by the record,' not

20

whether it was right or wrong in its determination of impartiality." *Id.* (quoting *Wainwright*, 469

U.S. at 424). The trial court's factual determination is entitled to a presumption of correctness,

which is rebuttable only by clear and convincing evidence under 28 U.S.C. § 2254(e)(1).

*Dennis*, 354 F.3d at 520.

In this case, Petitioner claims he was denied his Sixth Amendment right to an impartial

jury. Specifically, Petitioner argues the trial court conducted an insufficient investigation of his

sister-in-law's claim that she saw a man with the victim's family speaking with two jurors. The

Court of Appeals rejected this claim, concluding the trial court took appropriate steps to ensure

Petitioner received a fair trial:

> Both the United States and Michigan Constitutions guarantee a criminal
> defendant a fair trial by an impartial jury. US Const, Am VI; Const 1963, art 1, §
> 20; *Duncan v. Louisiana*, 391 U.S. 145, 149; 88 S Ct 1444; 20 L.Ed.2d 491
> (1968); *People v. Tyburski*, 445 Mich. 606, 618; 518 NW2d 441 (1994). In this
> case, contrary to defendant's contention, the trial court took appropriate steps to
> ensure that defendant received a fair trial. The record shows that defendant's
> sister-in law, Nedrala McLaughlin, claimed that she saw a male member of the
> victim's family or one of his friends talking to two male jurors in the hallway.
> McLaughlin testified that she did not hear the contents of the alleged
> conversations. After McLaughlin identified the two male jurors in question, the
> trial court conducted a lengthy, individualized inquiry of the two jurors regarding
> whether they had conversations with a member of the victim's family or friends.
> After hearing the answers from the two jurors, the trial court determined that the
> jurors were not involved in improper conversations, and found that the two jurors'
> statements that they honored the court's directive not to discuss the case with
> anyone were credible. It is presumed that jurors honor their oaths and are
> truthful. *People v. King*, 215 Mich.App 301, 303; 544 NW2d 765 (1996). Also,
> "[i]t is well established that jurors are presumed to follow their instructions."
> *People v. Graves*, 458 Mich. 476, 486; 581 NW2d 229 (1998). Both jurors
> testified that no one made any effort to talk to them and that they followed the
> court's instruction. Furthermore, there was no evidence corroborating the
> allegation that the conversations occurred or that defendant was prejudiced in any
> way by the conversations. Consequently, the trial court did not err.

*Shisler*, No. 256122, 2005 WL 2679686, at *3.

21

Petitioner argues that the only Supreme Court case cited by the Court of Appeals is *Duncan*, and that *Duncan* is not applicable because it involves denial of a jury trial rather than denial of an impartial jury. However, contrary to Petitioner's contention, "[a] state court decision need not cite Supreme Court precedent, or even reflect awareness of Supreme Court cases, 'so long as neither the reasoning nor the result of the state court decision contradicts them.'" *Dennis*, 354 F.3d at 517-18 (quoting *Early v. Packer*, 537 U.S. 3, 8 (2002)). The fact that the Court of Appeals cites *Duncan* for the general proposition that a criminal defendant has the right to a fair trial by an impartial jury has no bearing on the reasonableness of that court's subsequent analysis.

Petitioner also argues that, even though the trial court conducted a hearing, it was an abuse of discretion or clear error to believe the testimony of both jurors over that of Petitioner's sister-in-law. However, a habeas court does not re-weigh the evidence or reassess the credibility of witnesses whose demeanor has been observed by the trial court. *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003). Furthermore, under 28 U.S.C. § 2254(e)(1), a state court's factual findings are presumed correct and it is the petitioner who bears the burden of rebutting that presumption by clear and convincing evidence. Petitioner's disagreement with the factual findings of both the trial court and the Court of Appeals falls short of meeting this standard.

Finally, Petitioner argues that the trial court's investigation was insufficient to prove his jury was unbiased. In support of his argument, Petitioner cites *United States v Ferguson*, 486 F.2d 968 (6th Cir. 1973) and *Stone v United States*, 113 F.2d 70 (6th Cir. 1940), for the proposition that it is the government's burden to prove a jury was impartial. Contrary to his claim, the Supreme Court clarified in *Smith* that it is the defendant who bears the burden of

22

showing bias, holding "the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." *Smith*, 455 U.S. at 215.  Consequently, as the Sixth Circuit stated in *United States v. Corrado*, 304 F.3d 593, 603 (6th Cir. 2002), it is the defendant who bears the burden of showing prejudice and "[u]nder no circumstance will prejudice be presumed."

Against that backdrop, the Court concludes that Petitioner has failed to overcome the 28 U.S.C. § 2254(e)(1) presumption of correctness.  Petitioner is therefore not entitled to habeas relief regarding this claim.

### C.  Confrontation Clause Claim

In his third claim, Petitioner contends that the trial court violated his Sixth Amendment right to confront witnesses by allowing the prosecution to introduce a statement made by his co-defendant to his girlfriend, Allandra Carter.  The Court of Appeals rejected this claim, agreeing with the trial court's ruling that the statement was admissible as an adoptive admission under Mich.R.Evid. 801(d)(2)(b)44:

> We agree with the trial court's ruling that co[-]defendant's statements to Carter were not hearsay, but were adoptive admissions under MRE 801(d)(2)(B). An adoptive admission is admissible when it clearly appears that the defendant understood and unambiguously assented to the statements made.  *People v. Lowe*, 71 Mich.App 340, 346; 248 NW2d 263 (1976).  Whether the party's conduct manifested his assent to the statement of the other person is a preliminary question for the court.  *Id.*  In *Shemman v. Am Steamship Co*, 89 Mich.App 656, 673; 280 NW2d 852 (1979), this Court, quoting *Durbin v. K-K-M Corp*, 54 Mich.App 38, 50; 220 NW2d 110 (1974), explained:
>
> > An adoptive admission is the express adoption of another's statement as one's own.  It is conduct on the part of a party which manifests circumstantially that party's assent in the truth of a statement made by another.  The mere fact that a party had declared that he or another person made the statement is not in and of itself sufficient for a finding of adoption.  In order to find

23

adoptive

approval of the other's statement the circumstances surrounding
the other's declaration must be examined.

While it is improper to admit evidence of a defendant's failure to say
anything in the face of an accusation as an adoptive statement under MRE
801(d)(2)(B), *People v. Schollaert*, 194 Mich.App 158, 167; 486 NW2d 312
(1992), in the present case, during the conversation in which co[-]defendant
described the facts of the crime, defendant not only failed to object to his co[-
]defendant's statements, but offered details during the conversation which directly
implicated him in the crime.  Under these circumstances, defendant's statements
may reasonably be construed as manifesting his assent to the truth of the
statements of his co[-]defendant.  *See* MRE 801(d)(2)(B).  Therefore, the
statements were not hearsay and were properly admitted by the trial court.

Even if the statements were hearsay, they were properly admissible as a
statement against penal interest under MRE 804(b)(3).  Statements against penal
interest may be admitted as substantive evidence without violating the
Confrontation Clause if the prosecution can establish that the person making the
statement is unavailable and that his or her statements bore adequate indicia of
reliability.  *People v. Washington*, 468 Mich. 667, 671; 664 NW2d 203 (2003).  In
evaluating the indicia of reliability, the court must evaluate the circumstances
surrounding the making of the statement as well as its content.  *Id.* at 672, citing
*People v. Poole*, 444 Mich. 151, 165; 506 NW2d 505 (1993).

In the present case, the co[-]defendant was charged with the same crimes
and, therefore, was presumptively unavailable.  *Washington*, *supra* at 672.
Furthermore, the co[-]defendant's statements were voluntarily made to his
girlfriend (i.e., to someone to whom he would likely speak the truth), were made
within a short period of time after the commission of the crime and were made
without prompting or inquiry.  Moreover, the co[-]defendant did not minimize his
role or directly implicate the defendant, but in fact stated that he (the co[-
]defendant) shot the victim.  All of these factors weigh heavily in favor of finding
adequate indicia of reliability.  *Id.* at 672-673, citing *Poole*, *supra* at 165.
Consequently, even if the statements were hearsay, they were admissible on other
grounds.  This Court will not reverse where the trial court reaches the correct
result, albeit for a different reason.  *Lavey v. Mills*, 248 Mich.App 244, 250; 639
NW2d 261 (2001).  Finally, even assuming that co[-]defendant's statements were
not admissible either as adoptive admissions or as declarations against penal
interest, any error was harmless.  Here, co[-]defendant's statements did not
directly implicate defendant and were cumulative to other properly admitted
evidence, including Carter's testimony that she saw defendant with a gun before
the charged offense and defendant's own incriminating statements to Carter that
they had just robbed somebody and taken a car, a cell phone and a regular house

24

phone.  Improperly admitted hearsay evidence constitutes harmless error when it
is merely cumulative of other properly admitted evidence.  *People v. Van Tassel*
(*On Remand*), 197 Mich.App 653, 655; 496 NW2d 388 (1992).  Accordingly, any
error in the admission of co[-]defendant's statements was harmless.

*Shisler*, No. 256122, 2005 WL 2679686, at *4.

Claimed errors regarding state evidentiary matters are generally not cognizable in federal

habeas corpus actions unless the error rises to a level of depriving the petitioner of fundamental

fairness.  *Mattock v. Rose*, 731 F.2d 1236, 1242 ( 6th Cir. 1984). Habeas review is therefore

initially limited to a determination of whether the trial court's ruling denied the petitioner of a

constitutionally guaranteed right.  *Moore v. Tate*, 882 F.2d 1107, 1109 (6th Cir. 1989).

Assessment of the probative value and prejudicial effect of evidence should be left to the "sound

discretion of the trial court."  *Oliphant v. Koehler*, 594 F.2d 547, 555 (6th Cir. 1979).  In

essence, habeas review is not intended to decide whether a state trial court's evidentiary ruling

was correct, but whether any federal constitutional violations occurred.  *Byrd v. Collins*, 209

F.3d 486, 528 (6th Cir. 2000).

"When an evidentiary ruling is so egregious that it results in a denial of fundamental

fairness, it may violate due process and thus warrant habeas relief."  *Bugh v. Mitchell*, 329 F.3d

496, 512 (6th Cir. 2003).  Courts define the class of errors deemed to violate fundamental

fairness very narrowly and state-court-evidentiary rulings generally cannot rise to the level of a

due process violation unless they offend some principle of justice so rooted in the traditions and

conscience of our people as to be ranked as fundamental.  *Id.* at 512.

Even admission of evidence considered irrelevant under state law does not necessarily

give rise to federal constitutional error.  *Romano v. Oklahoma*, 512 U.S. 1, 9 (1994).  In fact, the

Supreme Court has found admission of likely prejudicial and distantly relevant evidence to not

violate due process.  In *Estelle v. McGuire*, 502 U.S. 62 (1991), the United States Supreme Court

also reemphasized that state law evidentiary matters are generally not cognizable on habeas

review:

> We have stated many times that "federal habeas corpus relief does not lie for
> errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *see also Pulley v.
> Harris*, 465 U.S. 37, 41, 79 (1984).  Today, we reemphasize that it is not the
> province of a federal habeas court to reexamine state-court determinations on
> state-law questions.  In conducting habeas review, a federal court is limited to
> deciding whether a conviction violated the Constitution, laws, or treaties of the
> United States.  28 U.S.C. § 2241; *Rose v. Hodges*, 423 U.S. 19, 21 (1975).

*Estelle*, 502 U.S. at 67-68.

Under both the Federal and Michigan Rules of Evidence, hearsay is defined an

out-of-court statement offered in evidence to prove the truth of the matter asserted.  Fed.R.Evid.

801(c); Mich.R.Evid. 801(c).  A party's own statement, however, is not hearsay, but rather, an

admission of a party opponent.  Fed.R.Evid. 801(d)(2)(A); Mich.R.Evid. 801(d)(2)(A).

Similarly, if a party against whom a statement is offered has manifested an adoption or belief in

its truth.  Fed.R.Evid. 801(d)(2)(B); Mich.R.Evid. 801(d)(2)(B).

Adoption of a statement can be by any appropriate means, such as language, conduct, or

even silence; the primary inquiry is whether the statement was one that, under the circumstances,

an innocent defendant would normally be induced to respond, and sufficient facts from which a

jury could infer the defendant heard, understood, and acquiesced in the statement.  *United States

v. Jinadu*, 98 F.3d 239, 244 (6th Cir. 1996).  As the Court of Appeals noted, Petitioner "not only

failed to object to his co-defendant's statements, but offered details during the conversation

which directly implicated him in the crime."  *Shisler*, No. 256122, 2005 WL 2679686, at *4.

Next, Petitioner cites *Monachelli v Graterford*, 884 F.2d 749, 753 (3rd Cir. 1989), for the rule expressed in *Bruton v United States*, 391 U.S. 123 (1968) that, "where the non-testifying defendant's extrajudicial statements are both inadmissible as substantive evidence against the other defendant and tend to implicate the other defendant, their admission violates the other's Sixth amendment right to confrontation."  Petitioner also cites *Ohio v Roberts*, 448 U.S. 56, 66 (1980), for the proposition that the Confrontation Clause requires that statements of an unavailable witness bear "adequate "indicia of reliability" before being admitted.  In essence, Petitioner argues that use of his accomplice's statements where his accomplice was not testifying violated his right to confront witnesses.

Contrary to this claim, as the Court of Appeals explained, the challenged statements are not hearsay by definition and, even if they were hearsay, fit within a well-established exception. Moreover, as the Supreme Court explained in *Davis v Washington*, 547 U.S. 813, 821 (2006). statements that are not testimonial in nature do no implicate the Confrontation Clause:

> The Confrontation Clause of the Sixth Amendment provides:  "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  In *Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), we held that this provision bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination."  A critical portion of this holding, and the portion central to resolution of the two cases now before us, is the phrase "testimonial statements." Only statements of this sort cause the declarant to be a "witness" within the meaning of the Confrontation Clause.  *See id.*, at 51, 124 S.Ct. 1354.  It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause.

The challenged statements in this case are non-testimonial in nature, as they were made by Petitioner and his accomplice to Petitioner's accomplice's girlfriend shortly after the murder

27

and carjacking.  Given that non-testimonial statements do not implicate the Confrontation

Clause, the admission of such statements would be left to state evidentiary rules over

hearsay–and perceived errors of state law are not cognizable on habeas review.  *Gilmore v.

Taylor*, 508 U.S. 333, 342, 344 (1993).

Against that backdrop, the Court concludes that Petitioner has failed to demonstrate that

the Court of Appeals' decision was contrary to, or an unreasonable application of, clearly

established Supreme Court precedent.  Petitioner is therefore not entitled to habeas relief

regarding this claim.

## VI.  Conclusion

For the reasons stated above, this Court concludes that Petitioner is not entitled to federal

habeas relief on the claims presented in his petition.

Accordingly:

**IT IS ORDERED** that Petitioner's "Petition for Writ of Habeas Corpus" is **DENIED**

**WITH PREJUDICE**.  (Dkt. # 1.)

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  November 3, 2009

I hereby certify that a copy of the foregoing document was served upon counsel of record on
November 3, 2009, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager